471 A.2d 1068

Nina S. DOBBYN

v.

John R. DOBBYN.

No. 1701, Sept. Term, 1982.

Court of Special Appeals of Maryland.

March 2, 1984.

664

George Z. Petros, Marlow Heights, with whom were Fisher & Walcek, Marlow Heights, on brief, for appellant.

Alvin L. Newmyer, Jr., Washington, D.C., with whom was Selma W. Samols, Silver Spring, on brief, for appellee.

Argued before LISS, GARRITY and GETTY, JJ.

GARRITY, Judge.

Nina Dobbyn challenges the $15,000.00 monetary award that she was granted on September 11, 1982, by the Circuit Court for Prince George's County in its disposition of the marital estate following an absolute divorce from her husband, the appellee John Dobbyn, on June 3, 1981 in the District of Columbia. She also contests the Circuit Court's failure to award her contribution

for mortgage payments and for condominium fees that she paid.[1]

The Dobbyns, who were both fifty-four years old at the time of trial, were married on December 6, 1967, and lived together as husband and wife for twelve years. They separated on November 12, 1979, when Mr. Dobbyn left the marital home.

Ms. Dobbyn, who was previously married for ten years before she was divorced in 1964, brought three children, ages three, five and seven from that marriage into her marriage with Mr. Dobbyn. There were not children born of the marriage between the Dobbyns.

---

1. The Circuit Court for Prince George's County exercised its powers over the disposition of the Dobbyns' marital estate pursuant to Md.Cts. & Jud.Proc.Code Ann. § 3–6A–02 (1980 Repl.Vol.) which provides:

> A Maryland court may exercise the powers conferred by this subtitle after a divorce or annulment has been granted by a court of a foreign jurisdiction, if one of the parties was domiciled in this State when the foreign proceedings were commenced, and the foreign court lacked or did not exercise personal jurisdiction over the party domiciled in this State or jurisdiction over the property at issue.

In the instant case, the Family Division of the Superior Court for the District of Columbia failed to exercise jurisdiction over the marital real property and marital personal property in issue in the course of rendering the Dobbyns' decree for an absolute divorce. Moreover, that court lacked jurisdiction to affect title of the marital real property in issue, as that property was located outside of the District of Columbia. Generally, a court cannot exercise jurisdiction over the title to land located in another state. *Wilmer v. Philadelphia & Reading Coal & Iron Co.,* 130 Md. 666, 101 A. 538 (1917).

Consequently, the Superior Court's lack of jurisdiction over the couple's marital real property, and its failure to exercise jurisdiction over their marital personal property, constituted sufficient basis for the Circuit Court for Prince George's County to exercise its powers under Section 3–6A–02, and thereby divide the marital property in accord with the provisions set forth under Maryland's Property Disposition and Annulment Act, Md.Cts. & Jud.Proc.Code Ann. (1980 Repl.Vol.) § 3–6A–01 through § 3–6A–07.

For the purpose of clarification, we note that the record demonstrates that the Superior Court had valid jurisdiction over the *res* of the marriage. Although Ms. Dobbyn contended at the trial level that she never "submitted" to the jurisdiction of the District of Columbia court, evidence showed she had been personally served in Maryland.

In the trial court, Ms. Dobbyn testified that although Mr. Dobbyn only earned $600.00 per month as a clerk with the Department of Health, Education and Welfare when they married, he wanted to support her and her children. For the first few years after they were married, Mr. Dobbyn received minimal wages. During those years, he undertook training and education to become a stockbroker. Therefore, Ms. Dobbyn, who worked as an executive secretary and office manager with the United States Senate Subcommittee on Labor, produced most of the family income during her husband's career training.

Although Mr. Dobbyn eventually became a commodities broker with an income of as much as $180,000.00 per year, he was plagued with gross financial difficulty during the earlier years of marriage. When his wife became disabled and retired in 1969, Mr. Dobbyn was earning $8,000.00 per annum.[2]

Testimony at trial disclosed that Mr. Dobbyn did take care of his wife and her children despite his wife's constant complaints that he did not make enough money to provide for them. Mr. Dobbyn paid all living expenses incurred by his wife and her children. He also paid the children's medical bills, school tuition, gave each of them a car, and paid the costs of all vacations and trips. The Dobbyns purchased a marital home in Tantallon, Maryland, and an unimproved lot in Lehigh Acres, Florida. Furniture, cars, and all requisites of a marital estate were purchased as well.

As the marriage progressed, Mr. Dobbyn, who had authority to handle the investment accounts, acquired stocks, commodities, and other investments jointly with his wife, as well

---

**2.** Mr Dobbyn's approximate gross earnings during the marraige are as follows:

| | | | |
|---|---|---|---|
| 1968 | $ 6,500.00 | 1974 | $ 63,314.00 |
| 1969 | 8,000.00 | 1975 | 120,000.00 |
| 1970 | 9,000.00 | 1976 | 180,674.00 |
| 1971 | 10,810.00 | 1977 | 80,202.00 |
| 1972 | 22,069.00 | 1978 | 119,426.00 |
| 1973 | 32,869.00 | 1979 | 103,765.00 |

as in his own name, through the companies that employed him. There were also large entertainment expenditures as Mr. Dobbyn's success as a broker demanded that he nurture his clientele in such a manner.

Mr. Dobbyn left the marital home on November 21, 1979 to reside in the District of Columbia. On June 11, 1981, Mr. Dobbyn married his present wife, Dyan McDonald Dobbyn, a Vice-President of Shearson, Hayden, Stone, a prestigious brokerage firm that had employed Mr. Dobbyn.[3] This marriage produced two children, and Mr. Dobbyn adopted Dyan Dobbyn's child from a previous marriage.

From the time Mr. Dobbyn deserted Nina Dobbyn until October, 1980, he retained possession of all investments and securities, and periodically withdrew funds from them for his personal use. Within that period, he voluntarily paid the home obligations and expenses on the marital property, as well as the utilities, his wife's medical bills, and support to his wife of $750.00 per month.

Ms. Dobbyn initially filed for a divorce *a vinculo matrimonii* on May 16, 1980. When the matter was heard on February 5, 1981 before Judge Meloy, Ms. Dobbyn abandoned her prayer for divorce and proceeded on prayers of alimony and attorney's fees. Alimony in the amount of $1500.00 per month and counsel fees of $3,000.00 were awarded to her. An order reflecting the award was signed on February 18, 1981.

On February 27, 1981, Ms. Dobbyn filed a Supplemental Bill of Complaint for a divorce *a vinculo matrimonii*. Although she again abandoned her prayer for divorce, Ms. Dobbyn requested that the marital estate be divided. When the matter was heard by Judge James H. Taylor on August 12, 1981, it was determined that the investment accounts and securities constituting marital property totaled $97,-000.00. After it was determined that Ms. Dobbyn already

---

**3.** Shearson, Hayden, Stone became Shearson/American Express.

had possessed or had access to $28,000.00 worth of marital property, she was awarded an additional $15,000.00.[4]

Appellant's dissatisfaction with the award and the chancellor's order prompted this timely appeal.

On appeal, four issues are presented for our consideration:

1. Whether the chancellor erred in failing to include traceable investment assets as marital property.

2. Whether the chancellor erred in valuing marital investment assets of stocks, securities, and other interest bearing accounts as of the date the initial divorce action was filed.

3. Whether the chancellor failed to make an appropriate monetary award to adjust the fair equities between the parties.

4. Whether the chancellor erred in denying appellant's request for an award of contribution as to funds she expended toward jointly owned real property.

I.

A. *Traceable Assets*

At the outset of our discussion, we point out that the appellant at trial and the appellee in oral argument, agreed to use the date Ms. Dobbyn, the non-faulting party, filed her bill of complaint for divorce (May 16, 1980) as the cut-off date *to determine what constituted marital property.* That issue, therefore, is no longer before us. Furthermore, we are not concerned with *the valuation date* of May 16, 1980 applying to any marital asset other than the disputed stocks, securities and interest bearing accounts as only those investment valuations have been challenged on appeal.

---

4. The monies which comprised the $28,000.00 sum included $6,000.00 from savings, $19,500.00 from a credit union account; $300.00 from a checking account; $2,000.00 representing the value of marital furniture retained by appellant; and $200.00 which was not accounted for by the trial judge in his summation of the values comprising that sum.

In rendering his bench opinion, Judge Taylor ruled, in pertinent part, as follows:

As to the value of Mr. & Mrs. Dobbyn's account on the 16th of May of 1980, when they filed for divorce, it would seem to me there were approximately $97,000.00 in the accounts, that is the credit union, Citizens, the commodities account and the stock accounts, and I am basing that on the figures as given by Mrs. Dyan Dobbyn, as well as the statements in the bank accounts. Now, it is indeed not the most precise determination of value, but I think, by the nature of the activity and the impreciseness of the testimony concerning it, I can only come up with an imprecise result, but I did consider all of the monies which he acquired as a consequence of the stock activities or commodities activities prior to May 16, and that based upon which I concluded, and that in conjunction with the monies from the sale of the furniture and the Citizens' accounts. . . .

The chancellor further determined as to the stock and commodities account that:

All monies which were acquired as a consequence of non-action on the part of Mr. Dobbyn and accrued as a consequence of its mere existence, the assets, the assets mere existence, . . . . ought to be considered as part of the estate, or as an asset of the estate.

The initial point of dispute raised by Ms. Dobbyn is that the chancellor erred in considering only those investment accounts as marital property which increased in value after May 16, 1980 as a consequence of the assets mere existence rather than as a result of active trading by Mr. Dobbyn.

In support of that contention, the appellant avers that all disputed marital investment accounts, including their traceable form, should have been classified as marital property. She reasons that all such marital assets which increased in earnings through interaccount trading, should not have inured to the sole benefit of her husband merely because he

happened to be in possession of the accounts, and elected to trade them actively after May 16, 1980. We agree.

Marital property under § 3–6A–01(e) of the Marital Property Act [5], is defined as:

[A]ll property, however titled, acquired by either or both spouses during their marriage. It does not include property acquired prior to the marriage, property acquired by inheritance or gift from a third party, or property excluded by valid agreement or property directly traceable to any of these sources. Md.Cts. & Jud.Proc.Code Ann. § 3–6A–01(e) (1980 Repl.Vol.)

The cardinal rule in the construction of a statute is to effectuate its actual legislative intent. The primary source for discerning the legislative intent is the language of the statute itself. "If the words contained therein are plain and unambiguous, and if they express a definite and sensible meaning, then their meaning is conclusively presumed to be that intended by the Legislature." *Athanason v. Athanason,* 48 Md.App. 231, 234, 426 A.2d 16 (1981).

As the Court of Appeals observed in *District Land Corporation v. W.S.S.C., et al.,* 266 Md. 301, 307, 292 A.2d 695 (1972):

In determining the legislative intent, we examine the words used as the primary source for discovering that intent. (citation omitted)

If the words are clear and unambiguous, generally speaking, the search for the legislative intent ends. If, however, the words are not clear and unambiguous, then the well-established rules of statutory construction apply. (citation omitted)

In light of its provision that property traceable from an excluded asset not be considered marital property, it is quite plain, sensible and free from ambiguity that property trace-

---

**5.** Maryland's Property Disposition and Annulment Act, Md.Cts. & Jud.Proc.Code Ann. (1980 Repl.Vol.) § 3–6A–01 through § 3–6A–07 is commonly referred to as the Marital Property Act.

able from a nonexcluded asset acquired during marriage be considered marital property.

Although factually distinguishable from the case *sub judice*, the holding and rationale of *Harper v. Harper*, 294 Md. 54, 448 A.2d 916 (1982) would appear to be supportive of our construction. *Harper* involved the equitable distribution of funds from the sale of a marital home acquired during marriage that had been built upon property purchased by the husband prior to marriage. In construing Section 3–6A–01(e) of the Act as protecting the premarital interest of the husband from being "transmuted" into marital property, the Court applied the "source of funds" theory, and determined that a spouse who contributed nonmarital funds would be entitled to recoup that proportionate share as such funds were excluded from being classified as marital property.

■ We hold that as to the unliquidated marital investment accounts as of May 16, 1980, the court erred in failing to classify all such accounts, including their traceable assets, as marital property.

II.

*Valuation of Stocks and Securities*

The appellant next contends that under Section 3–6A–05 and Section 3–6A–01(e) of the Maryland Property Act, the chancellor committed error as a matter of law in valuing marital stocks, securities and other interest bearing accounts as of May 16, 1980. She opines that the proper valuation date for these assets was the date of trial of the property dispute, August 12, 1982.

■ We are of the opinion that the chancellor erred in valuing the investment accounts as of the date the initial divorce complaint was filed. We disagree, however, with the appellant's contention that the accounts should have been valued as of the date of trial of the property dispute. We hold that those assets of securities, stocks, bonds, options, commodities, and reserve funds, including their tracea-

ble form, however titled, which existed as marital property on May 16, 1980, and which continued to bear interest or either lose or gain in value or amount through stock splits or interaccount trading, are to be valued as of the earlier time of either liquidation or June 3, 1981, the date the parties were granted an absolute divorce by the Superior Court of the District of Columbia.

Section 3–6A–05 of the Marital Property Act, which governs the equitable distribution of marital property when divorcing spouses are unable to agree between themselves on how such property is to be divided, provides:

(a) *In granting an absolute divorce . . . the court shall determine which property is marital property if the division of property is an issue. . . .*

(b) *The Court shall determine the value of all marital property.* After making the determination, the court may grant a monetary award as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded. . . . (emphasis added) (Md.Cts. & Jud.Proc.Code Ann. § 3–6A–05) (1980 Repl. Vol.)

Under Section 3–6A–01(e) of the Marital Property Act, marital property is defined as:

[A]ll property, however titled, acquired by either or both spouses *during their marriage.* Md.Cts. & Jud.Proc.Code Ann. § 3–6A–01(e) (1980 Repl.Vol.) (emphasis added)

■ As a matter of law, we have consistently held that a marriage is considered terminated by divorce as of the date of the decree granting a divorce *a vinculo matrimonii. Altman v. Altman,* 282 Md. 483, 386 A.2d 766 (1978); *Dackman v. Dackman,* 252 Md. 331, 250 A.2d 60 (1969); *Browning v. Browning,* 224 Md. 399, 168 A.2d 506 (1961); *Wright v. State,* 198 Md. 163, 81 A.2d 602 (1951); *Brewster v. Brewster,* 204 Md. 501–507, 105 A.2d 232 (1954); *Staub v. Staub,* 170 Md. 202, 183 A. 605 (1936); *Hensel v. Smith,* 152 Md. 380, 136 A. 900 (1927); *Crise v. Smith,* 150 Md. 322, 133 A. 110 (1926). In light of this rule, we think that under Section

3–6A–01(e) "during the marriage" means the time between the commencement of the marriage and its dissolution by death, annulment or the issuance of a decree of absolute divorce.

In harmony with the general rule governing the point of termination of a marriage, the legislature established that property interests between spouses are to be adjusted "when a marriage is dissolved." This proposition is explicitly set forth in the preamble to the Marital Property Act which provides in pertinent part:

> [T]hat when a marriage is dissolved the property interests of the spouses should be adjusted fairly and equitably... (1978 Md.Laws, ch. 794 at 2305. *Harper v. Harper,* 294 Md. 54, 63, 448 A.2d .916 (1982) (emphasis added)

We think that the precision and efficiency with which the statute was meant to operate in the distribution of marital assets is aptly demonstrated by the particular facts of this case when the parties could not reach an agreement as to a date of finality regarding the valuation of investment assets. Herein, assets subject to being identified as marital property included, among other items, an array of valuable stocks, commodities, securities, and interest bearing accounts. As a consequence of the unique nature and sensitivity of the stock and commodity markets, these financial products are inherently endowed with a high propensity towards fluctuation. Consequently, the value of these assets could, depending upon market highs and lows, substantially increase or decrease at any time between the filing of the complaint and the entry of the final decree. On the other hand, their value could have been significantly changed through liquidation, reinvestment, or both.

■ Investment assets acquired by either or both spouses during marriage, regardless of title, constitute marital property, and unless otherwise agreed, are to be valued as of the date of the decree of absolute divorce based upon the evidence produced at trial. In the absence of an agreement

as to a date certain, if the chancellor needs additional time to determine value as of the date of the decree due to fluctuations in the market, he may reserve in the decree an additional ninety days. Section 3–6A–05(a). *Brodak v. Brodak,* 294 Md. 10, 447 A.2d 847 (1982); *Russell v. Russell,* 50 Md.App. 185, 436 A.2d 524 (1981).

■ On the basis of the rationale we have set forth, rather than having utilized the date the non-faulting party filed her bill of complaint to fix the value of the marital assets, the chancellor should have determined whether the increases in the disputed stocks, securities, and interest bearing accounts, were "gained by or as a result of effort" of either or both spouses after the beginning of their marriage, but before the date of the decree dissolving that marriage.

■ All of the accounts in dispute which yielded increases apparently did so before June 3, 1981, the date of the divorce decree. Therefore, all of these increments, as well as the accounts, constituted marital property and were subject to equitable distribution between the parties under Section 3–6A–05. We must remand for revaluation of the investment accounts.

In so holding, we are cognizant of the exceedingly difficult and tedious technical assessment of financial assets in this particular matter. The inherently complicated task was itself hampered by the gross disparities in the values of the marital accounts. The manner in which the testimony was presented plagued the chancellor in his valiant effort to decipher the voluminous assortment of account statements, market trends, as well as the unique method by which commodity profits are assessed. Indeed, the chancellor, who was without the aid of a court appointed auditor or special auditor, remarked that he could "only come up with an imprecise result." We observe for the guidance of the chancellor that had he properly determined that the increases were to be valued as marital property and the inquiry directed to whether there was sufficient evidence to support the trial court's monetary valuation of each account, we

would have been compelled to have reversed and remanded the case on grounds of insufficient evidence because it is impossible to determine from this record what values the trial court determined each account was worth in deducing that all of those accounts were worth an estimated $97,-000.00. See *Schwartzman v. Payne,* 203 Md. 256, 100 A.2d 23 (1953); *Green v. Green,* 182 Md. 571, 35 A.2d 238 (1944); *Mendelis v. First Lithuanian Building & Loan Ass'n of Baltimore City,* 168 Md. 488, 178 A. 238 (1935); *Wisner v. Wilhelm,* 48 Md. 1 (1877); Md.Rule 595.

## III.

### Equitable Distribution of Marital Assets

In explaining part of the basis of his decision as to making the unequal monetary award, the chancellor stated, in pertinent part:

We also know that he is married and has three children, and that he has to provide for those children in conjunction, of course, with the income or the obligations of his present wife. But we must also bear in mind that this is a man fifty-four years of age without "a fixed income" and who, apparently has no retirement and has to provide a livelihood for himself as well as his children, and pay $1500 a month alimony to his former wife; a former wife who had been married before and brought into that marriage three children, each of whom, apparently was assisted in the acquisition of a college education by Mr. Dobbyn... [R]ealizing that it would certainly be expected that his children of his second marriage by him ought to have no less an opportunity, based on his own education, his own background, and his standing in the financial community, and the court must also bear . . . in mind that this man is fifty-four years old, the children six months of age, and we can't stifle him, notwithstanding that the factor contributing to the breakup of this, or causing the breakup of the marriage was his leaving of the family home.

While recognizing that it is within the chancellor's discretion to award a greater monetary amount to a spouse, Ms. Dobbyn contends the chancellor erroneously considered the factor of her former husband's new obligations, such as providing for his children's education. She avers that circumstances which came into being after the marital estate had been assembled, should not have been used by the chancellor when deciding how the property interests in that estate should be equitably divided.

As statutes are to be construed reasonably and with reference to the purpose to be accomplished, we shall examine the purpose of the monetary award and its attendant factors to be considered by the chancellor in its execution.

We are again drawn to the very heart of the statutory scheme embodied within the Marital Property Act. If the division of property is an issue after the chancellor has characterized all property owned by the parties, however titled, as either non-marital or marital, and has determined the value of the marital property, the chancellor, who does not have power to affect or transfer title to specific property, "may grant a monetary award as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded". Courts and Judicial Proceedings Article, § 3–6A–05(b); *Grant v. Zich,* 53 Md. App. 610, 456 A.2d 75 *cert. granted,* 296 Md. 110 (1983); *Deering v. Deering,* 292 Md. 115, 437 A.2d 883 (1981); *Ohm v. Ohm,* 49 Md.App. 392, 431 A.2d 1371 (1981).

As precisely explained by the late Judge Moore in *Ward v. Ward,* 52 Md.App. 336, 339, 449 A.2d 443 (1982):

The monetary award is thus an addition to and not a substitution for a legal division of the property accumulated during marriage, according to title. It is intended to compensate a spouse who holds title to less than an equitable portion of that property.... What triggers operation of the statute is the claim that a *division* of the parties' property according to its title would create an inequity which could be overcome through a monetary award.

■ In quest of an equitable adjustment of the division of the marital property between the parties, the chancellor must consider the nine factors enumerated in Section 3–6A–05(b). *Deering v. Deering, supra; Schweizer v. Schweizer,* 55 Md.App. 373, 462 A.2d 562, *cert. granted,* 298 Md. 48 (1983). These nine factors are:

(1) The contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) The value of all property interest of each spouse.

(3) The economic circumstances of each spouse at the time the award is to be made;

(4) The circumstances and facts which contributed to the estrangement of the parties;

(5) The duration of the marriage;

(6) The age and the physical and mental condition of the parties;

(7) How and when specific marital property was acquired, including the effort expended by each party in accumulating the marital property;

(8) Any award or other provision which the court has made under this Subtitle 6A with respect to family use personal property or the family home, and any award of alimony; and

(9) Such other factors as the court deems necessary or appropriate to consider in order to arrive at a fair and equitable monetary award.[6]

Although the Act provides the chancellor with sufficient discretion to exercise flexibility in crafting a fair and equitable monetary award, the extent of that discretion is not

---

**6.** It is most instructive, as to the question of relevancy of the factors to the marriage, to note that when the Governor's Commission on Domestic Relations Laws was discussing the purpose and mission of the monetary award factors, a dispute arose over including fault or "marital misconduct" as a factor. It was argued that such a factor was not relevant to the equities and rights of the parties in the marital property they had accumulated during the marriage. The Commission disagreed and stated in its report to the Governor:

As virtue, embodied in the respective contributions of the spouses to the well-being of the family which is involved in the first factor,

unbridled. It is tethered to consideration of the statutory factors and guided by the legislative remedial purpose to bring about *de facto* equity otherwise encumbered by legal title not reflective of marital ownership.

■ It is clear that the purpose of the Act is to allocate assets acquired during marriage and the function of a monetary award is to equitably adjust the parties' rights in such property "with careful consideration being given to both monetary and nonmonetary contributions made by the respective spouses to the well-being of the family".[7] Circumstances not reasonably related to the joint enterprise of the marital unit or expressly included as factors, are not ordinarily relevant and should not be considered when fashioning a fair and equitable monetary adjustment.

■ It is readily apparent that the chancellor was in the process of examining Mr. Dobbyn's "economic circumstances" when recognizing Mr. Dobbyn's obligation to plan for the education of his children. Such passing observation was made in the context of considering Mr. Dobbyn's financial status in light of the need to satisfy the rather large alimony payments when he was not entitled to a fixed salary or retirement income. Under the circumstances of this case, we cannot say the chancellor abused his discretion when

is relevant to the rights and equities of the parties in their marital property, so also is its correlative of fault, embodied in the fourth factor, which refers to the circumstances and facts which contributed to their estrangement. Indeed, it is difficult to see how an adjustment of the rights of the parties could be thought of as equitable, if it failed to consider either of these factors, together with the others named in this Section. It is not suggested that either of these concepts is easy to calibrate, or that its measurement comes readily to hand, but certainly equity requires that the listed factors be weighed by the Court and that the parties' contribution to the familial well-being and their contribution to familial ill-being both be considered. The Commission considers that the nine factors set forth here will go as far as a statute can, in providing for a truly fair and equitable adjustment of the parties' respective rights concerning their marital property. (Report of the Governor's Commission on Domestic Relations Laws, at 11 (1978).

7. Preamble to the Act 1978 Laws, ch. 794 at 2305.

considering the overall economic factors of Mr. Dobbyn's situation.

## IV.

### Contribution

■■■■ Appellant further opines that the trial court was clearly erroneous in not awarding her contribution for "all mortgage payments" that she "had to make" on the marital home and condominium as well as condominium fees that she paid. She claims one-half of all mortgage payments made prior to Judge Meloy's order for permanent alimony on February 18, 1981, and total reimbursement for all such payments made thereafter.

In support of her position, Ms. Dobbyn avers that the chancellor erred in concluding that there is no right of contribution between tenants by the entireties. We agree and think that the chancellor was inaccurate as a matter of law in reasoning that a right to contribution does not exist between tenants by the entirety.[8]

■■■■ Generally, a co-tenant who pays the mortgage, taxes, and other carrying charges of a tenancy by the entirety, is entitled to contribution from the other. *Crawford v. Crawford,* 293 Md. 307, 443 A.2d 599 (1982). There is no ironclad rule, however, obligating an ousted spouse to contribute funds to the spouse in possession as reimbursement for monies expended by him or her during the period of an ouster. *Bender v. Bender,* 50 Md.App. 174, 436 A.2d 518 (1981). Whether contribution should be awarded is determined on a case by case basis. *Id.* at 181, 436 A.2d 518. This determination is governed by equity or fairness under the attendant circumstances of each case. *Id.*

■■■ In the instant case, the chancellor's clear error as to the rule governing contribution to a co-tenant by the entire-

---

**8.** Moreover, the parties held title to the property as tenants in common by operation of law subsequent to the absolute divorce granted by the Superior Court for the District of Columbia on June 3, 1981.

ty and his determination that appellant was not entitled to contribution in light of that misjudgment, in effect, precluded an actual determination of whether she was entitled to contribution. In so holding, we are mindful of the fact that Ms. Dobbyn may have ousted her husband in July 1981 when she threatened to kill him if he did not leave their Ocean City condominium, pushed him outside of the residence, and locked the door. On the other hand, when this evidence is weighed against the fact that Mr. Dobbyn, who had remarried, was attempting to enter the condominium with his new bride and stepchild; and the fact that Ms. Dobbyn had permanently moved into the condominium because she had nowhere else to go, it may not be sufficient to constitute an ouster. Nevertheless, the issue of whether there was an ouster, and the issue of whether a grant of contribution to the appellant would be equitable and fair, are matters that should have been considered and resolved in light of the evidence. Since this was not done, we must also remand the question of contribution.

JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE.