584 A.2d 128

**Arthur Victor FOX**

v.

**Pamela Kelly FOX.**

**No. 370, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Jan. 18, 1991.

**450**

William Connelly (Stern and Connelly, on the brief), Camp Springs, for appellant.

James G. Nolan (Witt, Nolan & Bindeman, on the brief), Washington, D.C., for appellee.

Argued before BISHOP, ALPERT, and BLOOM, JJ.

BLOOM, Judge.

By judgment of absolute divorce, the Circuit Court for Prince George's County terminated the marriage of Arthur V. Fox (hereinafter referred to as "Arthur" or "husband") and Pamela K. Fox (hereinafter referred to as "Pamela" or "wife"). Neither party was satisfied with the financial aspects of the judgment, and both appealed.

All of Arthur's complaints involve the determination that a corporation, of which he is sole stockholder, is marital property, and the valuation of that property. He presents to us the following questions:

1. Whether the trial court was correct in ruling that The Chem–Met Co. was marital property.
2. Whether the trial court acted in an arbitrary and capricious manner in increasing the value of The

Chem–Met Company's inventory by 20% in computing the tangible asset value of the company.

3. Whether the trial court acted arbitrarily or without any factual basis in adjusting the appellant's compensation and disregarding other expenses in determining the goodwill value of The Chem–Met Company.

4. Assuming that the capitalization of excess earnings method and the economic adjustments which were made by the appellee are valid, whether the court made an error in computing the goodwill figure for The Chem–Met Company.

5. Whether the trial court committed error in determining that The Chem–Met Company had goodwill.

Pamela's complaints, on the other hand, involved the denial of alimony, suit money, and counsel fees and the valuation of Arthur's retirement and profit sharing plans. She submits the following questions for our consideration.

1. Whether the trial court erred in refusing to award appellee alimony or a reservation thereof.

2. Whether the trial court erred when it elected to utilize the values of appellant's retirement and profit sharing plans as of 30 September 1988, rather than the date of divorce, when determining what portion thereof would be transferred to appellee.

3. Whether the trial court erred when it failed to award appellee attorneys' fees and suit money.

It appears to us that the chancellor may have made an arithmetical error or else misspoke when he determined the value of the corporation's goodwill. We believe he also erred in calculating the value of Arthur's retirement and profit sharing plans (both of which were marital property) by using outdated figures. Accordingly, we shall vacate the monetary award, based on those valuations. Our holding with respect to the monetary award requires that we also vacate the denial of alimony or the reservation thereof as well as the denial of attorney's fees and suit money and remand to the circuit court for reconsideration. We find no

error or abuse of discretion with respect to the remaining issues raised by the parties.

## Facts

The parties participated in a marriage ceremony on 3 May 1974, but the divorce that Pamela had obtained from her first husband in the District of Columbia less than thirty days earlier was not yet final.[1] The parties then went through a second marriage ceremony on 5 July 1974. The trial court in the case *sub judice* made a factual determination, not challenged by either party, that the lawful marriage occurred on the latter date.

For several years prior to his marriage, Arthur worked for Fox Investment Company, formerly known as The Chem–Met Co., a Delaware Corporation, of which his father, Abraham L. Fox, was sole stockholder. On 19 June 1974 (between Arthur's first and second marriage ceremonies), Arthur, his father, and Raymond Hawryluk, another employee of the Fox Investment Company, acting as incorporators, formed a corporation, The Chem–Met Co., under the laws of the District of Columbia. The corporation was formed for the purpose of acquiring the assets of Fox Investment Company, it being Abraham Fox's intention to retire. Apparently, Arthur's father wanted his son to have a "partner," or co-owner of the business, and Mr. Hawryluk had been recruited with that goal in mind. Mr. Hawryluk, however, decided not to remain in the business and resigned from it. Succeeding Hawryluk as a prospective co-owner of the business was Arthur's brother, Samuel L. Fox, who eventually agreed to come into the venture as of September 1974. Arthur and Samuel Fox each put $5,000 into the new corporation and acquired 100 shares of no par value common stock. On 1 October 1974, the Chem–Met Co. acquired

---

1. District of Columbia Code, § 16–920, provides that a decree of absolute divorce or annulment shall not become final until the time for noting an appeal shall have expired and, if notice of appeal is entered, the decree shall not become effective until the date of final disposition of the appeal.

the going business and all of the assets of Fox Investment Co. for a total price of $189,000, the payment of which was to be in monthly installments over the course of years.

Following a heated quarrel between Arthur and his brother, on 3 September 1981 the corporation repurchased and retired all of Samuel Fox's stock for $200,000, leaving Arthur as sole stockholder of The Chem–Met Co. Samuel also signed a covenant not to compete, for which he was paid a total of $250,000 in 60 monthly installments.

On 8 September 1989, the court issued a judgment of absolute divorce; granted the parties joint legal custody of their minor children, who were to reside primarily with their mother; awarded child support; ordered the husband to pay certain expenses; and denied alimony and counsel fees. The court reserved ruling on all other property and financial matters. On 12 October, the court ordered that the parties' house be sold after certain repairs and improvements were made; again denied alimony and reservation of alimony; ordered that a certain bond and 600 shares of Cache stock owned by the husband be sold and the proceeds divided between the parties; granted the wife a monetary award equal to one-half of the value of The Chem–Met Co. as determined by the court and entered a monetary judgment in that amount; and ordered that the sums of $2,183.50, representing one-half of the value of the husband's IRA, $112,439, representing one-half of the value of the husband's profit sharing plan as of 30 September 1988, and $135,057.08, representing one-half of the value of the marital portion of the husband's pension plan as of 30 September 1988, be transferred to the wife.[2] The court

---

**2.** Absent consent of the parties, ordering the sale of property owned solely by the husband and the transfer of the husband's property to the wife, instead of increasing the monetary award *pro tanto*, was improper. Md.Code (1984) Family Law Article, § 8–202(b)(2), authorizes the court to partition or order a sale, in lieu of partition, of any property owned by both of the parties; § 8–202(a)(3) prohibits the transfer of ownership of property from one party to the other. Neither party objected below to these property dispositions or raised

having theretofore ordered the husband to pay some $6,666 in counsel fees, judgment was entered against him in that amount.

As noted *supra,* the only issues raised in the cross-appeals from the final judgment involve (1) the determination that the husband's corporation was marital property and the valuation of that property, which resulted in a monetary award of $337,064, which was reduced to a judgment; (2) denial of alimony, suit money, and counsel fees; and (3) valuation of the husband's profit sharing and pension plans. Additional facts relating to these issues will be set forth in the discussion to follow.

# I

We now turn our attention to appellant's first issue. Was the chancellor correct in ruling that The Chem–Met Co. was marital property?

Md.Family Law Code Ann., § 8–201(e), defines the term "marital property" as used in the Property Disposition in Annulment and Divorce Act, §§ 8–201 through 8–213:

>  (e) *Marital property.*—(1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.
>
>  (2) "Marital property" does not include property:
>
>  (i) acquired before the marriage;
>
>  (ii) acquired by inheritance or gift from a third party;
>
>  (iii) excluded by valid agreement; or
>
>  (iv) directly traceable to any of these sources.

During the trial the argument centered around two dates or events counsel regarded as critical: incorporation of The Chem–Met Co. on 19 June 1974 (prior to the valid marriage of the parties) and acquisition by the corporation of the

---

any issue concerning them in this appeal. The issue, therefore, is not before us; it may be deemed to have been waived.

business and assets of Fox Investment Company on 1 October 1974 (subsequent to the marriage).

The Chem–Met Co. was incorporated in and pursuant to the laws of the District of Columbia. Neither party gave notice of intention to rely upon foreign law pursuant to Md.Code (1989 Repl.Vol.), Cts. & Jud.Proc. Art., § 10–504, so we presume the laws of the District of Columbia, as to the effect of filing articles of incorporation on the creation of a corporation, to be the same as those of Maryland. *See Coppage v. Resolute Ins. Co.*, 264 Md. 261, 285 A.2d 626 (1972); *Dialist Co. v. Pulford*, 42 Md.App. 173, 399 A.2d 1374 (1979). And under Maryland law, the filing of articles of incorporation is conclusive evidence of the formation of the corporation. *Cardellino v. Comptroller of the Treasury*, 68 Md.App. 332, 511 A.2d 573 (1986).

Arthur argues that he formed and acquired the corporation before he was married, so by definition the corporation is nonmarital property. Md.Code (1984), Fam.Law Art., § 8–201(e)(2)(i). Pamela's contention, on the other hand, is that the date of formation of The Chem–Met Co. is unimportant because the corporation had no value until it acquired the business and assets of Fox Investment Company on 1 October 1974.

Addressing Pamela's contention first, we point out that it was based upon a fallacy. There is nothing in the record to indicate that Fox Investment Company sold its business and assets to The Chem–Met Co. for less than full value. As of 1 October 1974, therefore, when The Chem–Met Co. acquired assets worth $189,000 it simultaneously acquired a liability in the form of a promissory note for the same amount. The net value of the corporation remained the same, its initial capitalization.

Arthur's argument was also based upon a fallacy. The date the corporation came into existence is immaterial. In view of the fact that all of the testimony, especially that which pertained to value, referred to the corporation, the business it operated, and the assets of that business, it is

easy to see how the parties lost track of the fact that with respect to The Chem–Met Co., what Arthur owned, either as marital or nonmarital property, was the capital stock of the corporation.[3] The critical consideration, therefore, is when he acquired that stock. There is no direct evidence on this point in the record. Neither party thought to introduce the stock certificate or certificates issued to Arthur, or the stock ledger of the corporation, or the minutes of the organization meeting or of any meeting of the directors, or bank records, or cancelled checks, or any document that might reflect when Arthur subscribed for, paid for, or was issued stock in The Chem–Met Co. Purchase, payment, or acquisition of stock in the corporation was never mentioned by Arthur during his testimony. The deposition testimony of Samuel Fox, admitted in evidence, established that he acquired his stock in September 1974, but there was no direct testimony as to when Arthur acquired stock.

A reasonable inference may be drawn, from all of the circumstances surrounding the formation of The Chem–Met Co., that Arthur did not acquire his stock until September 1974, when his brother, Samuel, joined the venture. The corporation was formed for the sole purpose of acquiring the ongoing business founded by their father. Abraham Fox apparently did not want Arthur to be the sole owner, so Mr. Hawryluk was recruited. Mr. Hawryluk went to work for Fox Investment Company and was one of the incorporators of The Chem–Met Co., but decided not to join Arthur in purchasing the business. That is the reason Samuel Fox was invited to join the venture. Logically, until Samuel came aboard, thus inducing Abraham to go through with his plan to sell the business and retire, there would have been no reason for Arthur to put any money into the new corporation.

---

**3.** Valuing the assets of a closely held corporation whose stock is not traded in any market is an appropriate manner of valuing the stock. For a discussion of methods of evaluating the corporation, *see* McNaughton v. McNaughton, 74 Md.App. 490, 494–95, 538 A.2d 1193 (1988).

Since the evidence and logical inferences that may be drawn therefrom support a finding that Arthur's shares of stock in The Chem–Met Co. were acquired during the marriage, the chancellor's determination that it was marital property was not clearly erroneous. Consequently, it will not be set aside. Md.Rule 8–131(c).

## II

Arthur's remaining assertions of error all relate to the evaluation of The Chem–Met Co., which, as we have noted *supra*, was equivalent to the evaluation of his shares of stock in the corporation.

Five expert witnesses testified as to the value of the company; two of them testified as to the value of the real estate owned by The Chem–Met Co. Arthur's appraiser testified that the land had a value of $99,000. Pamela's appraiser assigned to it a value of $200,250. The trial court found the land to be worth $150,000; neither party contests that finding in this appeal.

Three experts testified as to the value of the other tangible assets as well as the goodwill of The Chem–Met Co. Arthur's first expert concluded that the net tangible assets of The Chem–Met Co. were worth $274,686 and that there was no goodwill of value. His second expert concluded that the value of the physical assets (excluding real property and inventory) was $83,395. He further opined that the value of the business, excluding real estate, was $159,000. Pamela's expert, on the other hand, testified that The Chem–Met Co. had tangible assets valued at $474,028 and goodwill valued at $372,876.

At the conclusion of all the evaluation evidence, the chancellor, accepting the opinion of Pamela's expert, Mr. Capron, except as to the value of the corporate real estate, found that the land and other tangible assets were worth $424,128.

The chancellor rejected Mr. Capron's evaluation of the goodwill of the company. His comments indicate to us that

he did so because he was persuaded that some substantial part of what Mr. Capron valued as goodwill of The Chem–Met Co. was really goodwill solely attributable to Arthur Fox rather than to the company. What he said, however, appears to us to be somewhat at variance with what he did. He said:

> The goodwill of this company as everyone who has listened to any part of this case sees Mr. Arthur Fox, that without Mr. Fox you do not have Chem–Met Co.—But this goodwill simply is alone, without his chemist, without the net worth that his father had successfully created and without the help that his brother had added to it. Is his goodwill alone worth $372,876? The court finds that his [sic] worth less than that, which was stated by Mr. Murphy. But the court finds in this case that the goodwill of Mr. Fox was worth $250,000, making a total value of the company of $724,128.

The final figure was later amended to $674,128 to correct an error stemming from the chancellor's trial notes.

■ These comments seem to indicate that of the $372,-876 figure assigned by Mr. Capron to goodwill, the court found that $250,000 represented what Arthur, personally, was worth to the company. If that were the case, however, the appropriate conclusion would be that the *company's* goodwill was worth $122,876 ($372,876 *less* $250,000). But instead of adding $122,876 to the value of the tangible assets, the chancellor added $250,000 to arrive at a total value for The Chem–Met Co. Arthur questions whether the chancellor erred in computing the goodwill figure (Issue 4). We are not sure. Was this apparent discrepancy a slip of the tongue as to what the chancellor found to be worth $250,000—Arthur's personal value to the corporation which would not be company goodwill—or the company goodwill after subtracting that which was personal to Arthur? Or did the chancellor simply add the wrong figures to the value of the tangible assets? Since we cannot tell precisely what the chancellor intended, and since the amount of the monetary award granted to the wife was clearly based upon the

total value assigned to the corporate assets, we shall vacate the monetary award of $337,064 and remand for clarification, correction, or reconsideration.

■ Issues II and III raised by Arthur question whether the chancellor acted arbitrarily or capriciously with respect to valuation of inventory and goodwill. The short answer to both of those questions is "No." Mr. Capron, called as a witness by Pamela, qualified as an expert. He appraised the tangible and intangible assets of the corporation and, with but one exception relative to real estate, the chancellor accepted Mr. Capron's opinion. The witness explained in detail how he arrived at his opinion with respect to each asset. We do not find his ratiocination or his ultimate opinion based thereon totally devoid of reason or logic. Therefore, even though we, in reviewing the chancellor's decision, might not have been persuaded or have accepted Mr. Capron's appraisal as correct or accurate, we can find nothing arbitrary or capricious in the chancellor's acceptance of it.

Arthur's fifth issue, questioning whether it was error to find that the corporation had goodwill, will receive the same answer as Issues 2 and 3. Goodwill has been defined as comprising "those advantages which may inure to the purchaser from holding himself out to the public as succeeding to an enterprise which has been identified in the past with the name and repute of his predecessor." *Hagan v. Dundore,* 187 Md. 430, 442, 50 A.2d 570 (1946) (quoting *Knoedler v. Boussod,* 47 F. 465, 466 (S.D.N.Y.1891), *aff'd,* 55 F. 895 (2nd Cir.1893)). Goodwill may exist in businesses that remain in the hands of their founders and might never be sold. In *Brown v. Banzinger,* 118 Md. 29, 35, 84 A. 79 (1912), the Court of Appeals quoted Lord Elden's definition of goodwill as "the probability that the old customers will resort to the old place." *See also Prahinski v. Prahinski,* 321 Md. 227, 582 A.2d 784 (1990).

■ Although one expert asserted that the corporation had no goodwill, Mr. Capron opined that it did. Despite

Arthur's contention that he, individually, is the reason for the success of the company, it is apparent that The Chem–Met Co. was the successor to a going business founded by Arthur's father. We find no error in the chancellor's acceptance of an opinion that the company enjoys goodwill independent of one person's presence. There may be a legitimate dispute as to the value of that goodwill, and the chancellor did not accept Mr. Capron's evaluation, but in the face of the evidence it is preposterous to assert that it was error to find that some goodwill existed.

### III

█ Pamela's second issue raises a question as to the propriety of the chancellor's valuation of Arthur's retirement and profit sharing plans as of 30 September 1988, instead of the date of divorce, 8 September 1989. She cites *Rosenberg v. Rosenberg*, 64 Md.App. 487, 497 A.2d 485 (1985), for the proposition that the trial court should have reserved some additional time at the close of trial in order to determine the value of Arthur's retirement and profit sharing plans. In *Rosenberg* we held that "marital property is to be valued as of the date of the decree of absolute divorce based upon evidence produced at trial." *Id.* at 507, 497 A.2d 485 (citing *Dobbyn v. Dobbyn*, 57 Md.App. 662, 676, 471 A.2d 1068 (1984)). Where only one month had elapsed between the end of the trial, when the retirement plan was evaluated, and the date of the decree, we found no error. *Id.* [64 Md.App.] at 507–08, 497 A.2d 485.

In the case *sub judice*, the evidence produced at trial encompassed the value of both the retirement and profit sharing plans as of 30 September 1988, one year prior to the divorce decree. According to Arthur, the values would not be updated until the end of the current fiscal year. As we pointed out in *Green v. Green*, 64 Md.App. 122, 494 A.2d 721 (1985), "equity requires that reasonable efforts be made to ensure that valuations of marital property approximate the date of judgment of divorce which includes a monetary award." *Rosenberg, supra,* [64 Md.App.] at 507, 497 A.2d

485 (citing *Green v. Green, supra,* [64 Md.App.] at 141, 494 A.2d 721).

The chancellor acknowledged that it could hold the matter open to obtain updated figures. Indeed, the court may reserve in the decree an additional 90 days to determine value. *Rosenberg, supra,* [64 Md.App.] at 507, 497 A.2d 485 (citing *Dobbyn, supra,* [57 Md.App.] at 676–77, 471 A.2d 1068); *see Broseus v. Broseus,* 82 Md.App. 183, 204, 82 Md.App. 183 (1990), also citing *Dobbyn* (the pension value must be found and assessed as of the date of the divorce).

Pamela attempted to secure updated figures by taking a deposition of Arthur, who was the administrator of both plans. Arthur resisted on the ground that he had already been deposed, and the court decided that he need not be subjected to a second deposition. Perhaps if the notice of deposition had referred to the plan administrator, instead of to Arthur by name, the court may have ruled otherwise. Nevertheless, since the only information available to the court at the time of trial was obviously too stale to permit a proper evaluation, the court should either have permitted the taking of Arthur's deposition or reserved disposition of the matter a little longer.

In view of the fact that we are vacating and remanding one aspect of the divorce judgment, pertaining to the monetary award, for further action by the court, we deem it appropriate to vacate as well those provisions of the divorce judgment that divided the retirement and profit sharing plans (in lieu of increasing the monetary award *pro tanto* ) as part of the equitable distribution of marital property contemplated by the chancellor. This will enable the court to redetermine the values of those plans as of the date of the divorce, or as close thereto as may reasonably be ascertained.

## IV

Pamela asserts that the trial court erred in refusing to award her alimony or to reserve it. "The calculation,

distribution, and duration of an award of alimony is governed by statutory standards." *Rogers v. Rogers*, 80 Md. App. 575, 589, 565 A.2d 361 (1989). Md.Family Law Code Ann., § 11–106, sets out factors to be considered by the trial judge in determining the appropriate duration and amount of alimony:

(a) *Court to make determination.*—(1) The court shall determine the amount of and the period beginning for an award of alimony.

(2) The court may award alimony for a period beginning from the filing of the pleading that requests alimony.

(3) At the conclusion of the period of the award of the alimony, no further alimony shall accrue.

(b) *Required considerations.*—In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contribution, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties; and

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits.

"The present social policy behind an award of alimony is the need to rehabilitate the dependent spouse so she or he may become economically self-sufficient." *Rogers, supra,* at 591, 565 A.2d 361; *see also Holston v. Holston,* 58 Md.App. 308, 473 A.2d 459 (1984); *Rosenberg v. Rosenberg,* 64 Md.App. 487, 497 A.2d 485 (1985).

In the case *sub judice,* the chancellor stated that in light of the (substantial) monetary award he would neither grant alimony nor reserve it.

The decisions with respect to a monetary award and the amount and duration of an award of alimony are interrelated and largely inseparable. *Rogers, supra,* [80 Md.App.] at 588, 565 A.2d 361. According to § 8–205(a)(9), alimony is a factor to be considered in granting a monetary award and under § 11–106(b)(11)(ii) a monetary award is a factor to be considered in determining whether to award alimony, its amount and duration. *Id.*

A monetary award is only one factor to be considered. The fact that the chancellor mentioned only that factor, however, does not mean that he ignored the other factors. A trial judge is presumed to know the law and to apply it properly, and mere failure by the chancellor to articulate the reasons for his decision does not prevent us from affirming that decision on appeal. In such a case, we can look to the record as a whole to garner support for the chancellor's decision. *Rogers,* 80 Md.App. at 591, 565 A.2d 361.

We see no indication in the record that the chancellor was not aware of the various statutory factors. He was certainly aware of the relative wealth and earning abilities of the

parties. We have no reason to doubt that the substantial monetary award he granted the wife was the *principal* factor, rather than the *sole* factor in his decision to deny alimony. He had ordered the husband to pay $2,000 per month as child support and, in effect, had transferred from the husband to the wife over $250,000 in property (half the proceeds from sale of a bond and certain stock, half of an IRA, a profit sharing plan, and a pension plan) in addition to the $337,064 monetary award and judgment based on the value of The Chem–Met Co. Furthermore, he had ordered the sale and distribution of the parties' homes, worth well over $600,000. It is apparent that the chancellor anticipated that the substantial sums of money awarded to the wife would produce substantial income which, added to the wife's anticipated income, would obviate any need for alimony.

According to Pamela, at the time of the divorce Arthur's earnings equalled $132,000 per year plus additional perquisites including an automobile, gas, and insurance. Responding to that assertion, Arthur pointed out that in her new career as a real estate agent Pamela hoped to earn between $30,000 and $40,000 within the first year. Arthur further suggested that the earnings capacity of the monetary award would increase Pamela's wealth considerably.

We are of the opinion that as a new real estate agent, paid by commission, Pamela's earnings were a matter of pure conjecture; in fact, in her most recent full time job she earned a total of $5.00 per hour. There may even have been some uncertainty as to when, or even if, Pamela would receive all the money contemplated from her monetary award.

We suggest that when, as in this case, the chancellor is disposed to deny alimony because an anticipated increase in earnings, or projected income from funds expected to be received in the near future, or both should obviate the necessity for alimony, reservation of alimony would be particularly appropriate. If alimony is simply denied and

the anticipated events that would make the dependent spouse self-sufficient fail to materialize, the court would be powerless to amend its action.

The wisdom of providing for the possibility that the future will be substantially different from that which is presently projected is exemplified by the facts of *Brashier v. Brashier,* 80 Md.App. 93, 560 A.2d 44 (1989). In that case, Judge Bishop, writing for this Court, pointed out that Mrs. Brashier's continued inability to alleviate certain conditions that kept her from becoming self-sufficient were unanticipated at the time of divorce. On that basis, we held that modification of the divorce order from an award of alimony for a limited period to one of indefinite duration was not an abuse of discretion.

Previously, when we have vacated monetary awards and remanded for further consideration, we have also vacated and remanded alimony awards, because the two are interrelated, and each is a factor to be considered in determining whether to award the other and in what amounts. *See Rogers v. Rogers, supra,* 80 Md.App. at 588, 565 A.2d 361; *Prahinski v. Prahinski,* 75 Md.App. 113, 138, 540 A.2d 833 (1988), *aff'd,* 321 Md. 227, 582 A.2d 784 (1990).

In the case *sub judice,* the chancellor, on remand, might reduce the valuation of the husband's stock in The Chem–Met Co., and might then, on that basis, reduce the monetary award, which would alter the projections as to the wife's future income. A redetermination of the value of the husband's retirement and profit sharing plans as of the date of divorce instead of one year earlier could increase the valuation and result in a greater award to the wife. Given the current state of the economy, however, that prospect is far from certain; the value of the funds conceivably could have been less at the time of the divorce than it was earlier.

We think it appropriate, therefore, that the issue of alimony should be remanded in order for the chancellor to reconsider his decision in accordance with any changes he might make in the monetary award and in light of what has

occurred since the decree. He will have an opportunity to determine whether the anticipated financial independence that would obviate the need for alimony has since come to pass. Has Pamela received any part of the monetary award and, if so, how much? What are her present employment and earnings? The answers to those questions could have considerable effect on the alimony issue.

What we have said with respect to alimony can be applied to counsel fees and suit money as well. Md.Code Ann. (1981) Fam.Law article, § 11–110, authorizes a court, in proceedings involving claims for alimony, to award reasonable and necessary litigation expenses, including counsel fees and costs. The court is required to consider two principal factors: (1) the financial resources and financial needs of both parties and (2) whether there was substantial justification for bringing or defending the action. We agree with the wife's assertion that there was substantial justification for her action. Since the financial status of the parties may change as a result of our remand for reconsideration of the other issues, we shall vacate the denial of counsel fees and remand for reconsideration of that order as well.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART, AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLANT AND CROSS-APPELLEE, ARTHUR V. FOX.