647 A.2d 818

Howard STRAUSS

v.

Josephine M. STRAUSS.

No. 1344, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Aug. 31, 1994.

Reconsideration Denied Oct. 25, 1994.

492

H. Gregory Skidmore, Cumberland (Linda M. Thomas, Skidmore & Alderson, Cumberland, Thomas C. Ries and Bruce A. Kaufman and Rosenthal, Kaufman & Ries, P.A., Baltimore, on the brief), for appellant.

Gorman E. Getty, III, Cumberland (Thomas D. Murphy, Rockville, on the brief), for appellee.

Argued before FISCHER, HARRELL and MURPHY, JJ.

HARRELL, Judge.

On 26 February 1993, the Circuit Court for Allegany County granted Jo Strauss, appellee and cross-appellant, an absolute divorce from Howard Strauss, appellant and cross-appellee. The divorce judgment provided her with a monetary award of $881,289.00 and indefinite alimony in the amount of $15,000.00 per month. Mr. Strauss filed a Motion to Alter or Amend Judgment on 5 March 1993, contending, *inter alia,* that the amount of alimony was excessive, the monetary award was inequitable, and the court had erred in valuing the parties' marital property. The court responded on 12 May 1993 by reducing the alimony amount established in the previous order to $2,000 per month, but leaving its other determinations

unchanged. Both parties appeal from this final judgment and present the following issues, which we have slightly rephrased, for our review:

*By Howard Strauss*

1. Did the trial court err in granting the monetary award because:

(a) its determination and valuation of professional goodwill as marital property were incorrect;

(b) its valuation of the tangible assets of the professional practice was clearly erroneous;

(c) its valuation of the parties' personal property was clearly erroneous; and

(d) ordering the award to be paid "forthwith" represented an abuse of the court's discretion?

*By Jo Strauss*

2. Was the reduction in alimony from $15,000 per month to $2,000 per month clearly erroneous, an abuse of discretion, and error?

## FACTS

The parties were married on 4 May 1972 in Silver Spring, Maryland. At the time of the marriage, Howard Strauss was a student in the University of Maryland Dental School and Ms. Strauss was employed as a nurse. In 1978, after Dr. Strauss completed an internship program in oral surgery at University Hospital in Baltimore, the parties moved to Cumberland, Maryland, where he opened a private office for the practice of oral and maxillofacial surgery. Ms. Strauss assisted her husband with the opening of the office, but returned home to be with the couple's children after he hired a full time staff. Dr. Strauss earned his board certification in oral and maxillofacial surgery in 1980.

In May of 1990, Dr. Strauss hired Lisa Long as a part-time registered nurse in preparation for the opening of a second surgical suite in his Cumberland office. The two became involved in a romantic and intimate relationship, which Ms.

Strauss discovered in April of 1991. Although the parties subsequently took a family vacation and participated in counseling in an attempt to reconcile their marriage, these efforts failed and they separated on 22 June 1991. At this time, Ms. Strauss learned of another instance of her husband's infidelity that had occurred even earlier in their marriage.

On 11 February 1992, Ms. Strauss filed a Complaint for Absolute Divorce on the grounds of adultery. A trial was held on 25 and 26 January 1993, during which the parties' financial situation was publicly dissected. First, the parties set forth several stipulations they had agreed upon regarding the division of marital property: (1) Ms. Strauss would receive the former marital home, valued at $297,600, free and clear of liens or encumbrances; (2) Dr. Strauss would receive possession of the vacation property, valued between $252,000 and $281,000, free and clear of liens or encumbrances; and (3) Ms. Strauss would retain certain items of personal property valued at $103,239 while Dr. Strauss's agreed items would total $53,473.

The court also considered the financial situation of Ms. Strauss and the Strauss' three children. As far as her income was concerned, Ms. Strauss testified that she had contributed no more than ten percent of the total family earnings, as she had abandoned her career as a Registered Nurse upon the birth of her first child in 1974. She also submitted a statement of her monthly expenses, which indicated that she required $7,429.37 each month to meet her personal needs and $5,105 to address adequately the needs of the children. Ms. Strauss testified that this expense list reflected her average monthly expenses for the thirteen month period immediately preceding trial.

By the time of trial, Dr. Strauss had opened a satellite office in Oakland, Maryland. The gross annual revenues from his total practice exceeded $1,000,000. He was the only board-certified specialist in oral and maxillofacial surgery in Western Maryland, drawing patients from a 75 to 100 mile radius of Cumberland to his main office. The court considered the

value of the dental practice as a part of the determination of marital property, and heard testimony from two opposing experts to establish its value.

Ms. Strauss's expert, Jon O. Clark, estimated the fair market value of the dental practice to be $1,197,000. He based this figure on market data and hypothetical transactions taken from an annual publication of a Philadelphia health care group entitled *The Goodwill Registry.* Mr. Clark included goodwill as a part of his computation, which he explained that the *Registry* defined as

> a combination of intangibles varying on a case-by-case basis as to existence and value. That combination might include location, use of a practice or individual's name, patient information, (embodied in a clinical record), a favorable leasehold, a covenant not to compete, compensation for past or future management and entrepreneurial services, payments made for referral to an associate or recommendation of a successor, patient lists, credit records, patient care and/or employee contracts, as well as assignments of future income.

Mr. Clark elaborated that "[h]ow they [The *Goodwill Registry* ] view goodwill is they bundle it in intangibles." Mr. Clark also considered two other valuation methods, which produced similar results, but rejected them based on his belief that they were inconsistent with Maryland caselaw.

On cross-examination, Mr. Clark explained that his estimate represented a combination of the business's adjusted book value ($546,000) and its intangible, or goodwill, value ($651,000). Counsel for Dr. Strauss inquired into these figures:

Counsel: Well, you've got this $651,000 goodwill figure. How much of the $651,000 represents goodwill of the corporation and how much of the $651,000 is based solely on the skill, experience and reputation of Howard Strauss?

Mr. Clark: My opinion is that the total amount represents the practice goodwill and that's the total amount that could be sold in a transaction, and of course, I base that on the

facts from this market data that has shown that amount that is possible to be sold.

Counsel: But that market data, this is from the *Goodwill Registry,* doesn't that specifically state to you that goodwill is also a combination of the individual's name and reputation?

Mr. Clark: I just answered in the affirmative. Yes, that's one of several factors that they list in the definition.

Counsel: In your opinion, can goodwill ever be separated into two components; namely, number one, professional goodwill, the goodwill of the corporation, and number two, goodwill which is personal to the practitioner?

Mr. Clark: Yes.

Counsel: Why didn't you do that in this case?

Mr. Clark: In this case, I'm basing my opinion on the market data, these transactions which represent the goodwill accruing to the practice, not the goodwill accruing to the person. So I am using these data to estimate the value of the practice goodwill.

Counsel: Then by completely disregarding the individual and his reputation, Howard Strauss, essentially what you have provided us with is an opinion of the goodwill of this corporation where the oral surgeon is John Doe. Isn't that correct?

Mr. Clark: That's correct.

Mr. Clark's testimony ended with the following exchange with the trial judge, who inquired about the value of personal goodwill in the expert's analysis:

Court: Do I interpret your testimony correctly when I assume that I have heard you say that, in effect, you did not break out of the goodwill figure, that you assigned to this business, any amount attributable solely to the personal reputation of Dr. Strauss?

Mr. Clark: Yes, Your Honor. That's correct.

Court: All right. In the market value approach in your schedule of the 17 transactions, I gather that there was no

attribution to personal reputation of any of the practitioner sellers in those cases. Is that a fair conclusion?

Mr. Clark: Yes, Your Honor. That's my understanding from the definition in the market data report that I read; that they considered to be professional practice goodwill. I believe they even call it that.

Court: Is there an acceptable method for breaking out, that is evaluating separately, the general goodwill of the business and that which is attributable solely to the personal reputation of the practitioner?

\* \* \* \* \* \*

Mr. Clark: I'm sorry. Difficult question to answer.... If we look at these data that I've presented in Exhibit 11 and following the guidance provided in the explanatory notes that come with the *Goodwill Registry* that it includes the professional goodwill that has gone along with the practice, the practice professional goodwill, and if we also assume, as the Courts have assumed, that personal goodwill cannot be sold, cannot be transferred, then what you have is a series of transactions in which there has been no personal goodwill recorded because ipso facto it cannot be transferred. And so the assumption in all this data is that this is the goodwill that could be transferred, and in fact, was transferred, and considered to be a bundle of intangible assets which have been transferred.

So as to your specific question about whether there is a methodology for determining, an analytical methodology for determining the amount of personal goodwill, in that it can't be sold, there generally isn't a methodology that I'm aware of to do that.

Appellant's expert, Dr. Stanley L. Pollock, testified following Mr. Clark's testimony. Dr. Pollock estimated the fair market value of the dental practice as of 31 December 1992 to be $288,614.00. He described his methodology in arriving at this estimate as "a very simple balance sheet approach" that did not include intangible assets of the business. He explained:

I've never seen a case in my entire experience where goodwill was so tied up, so bonded to one particular individual as I have in the case of Dr. Strauss.... I think this boils down to a fair market value of the tangible assets only because of the unique situation with Dr. Strauss's reputation, his skill, his ability.

Dr. Pollock contradicted Mr. Clark's earlier testimony in two fundamental respects. First, he criticized Clark's reliance on data taken from the *Goodwill Registry*, of which he claimed to be a contributor, as inappropriate. He advised the court that the *Goodwill Registry* assigns a fixed percentage of a business' total revenue to represent goodwill, and in this situation, where the dentist's reputation was so tied up with the practice, such an analysis cannot apply. Second, Dr. Pollock explained that normally it is possible to separate practice goodwill from personal goodwill based on the skill, expertise and reputation of the practitioner. Indeed, he claimed, such a division is done "all the time."

In the Memorandum and Judgment dated 26 February 1993, the Court granted Ms. Strauss an absolute divorce on the grounds of adultery and ordered Dr. Strauss to pay $15,000.00 monthly in alimony. The court also made the following findings as part of its determination to award Ms. Strauss a monetary award in the amount of $881,289.00: [1]

---

1. The court set forth the following calculation of this amount:

| | |
|---|---:|
| Marital property | $3,681,522.00 |
| Less pension/profit sharing | 780,722.00 |
| | $2,900,800.00 |
| Less corporate stock | $1,197,000.00 |
| | $1,703,800.00 |
| 50% | 851,900.00 |
| Less Josephine's (Ms. Strauss) share | 449,411.00 |
| | 402,489.00 |
| Plus 40% of corporate stock | 478,800.00 |
| | $ 881,289.00 |

7. Personal effects. The Court finds that the following items are not marital property as they were gifts to Howard: Westminster chimes clock, value $230.00; sterling silver service for twelve, Schofield Lorraine pattern, with serving pieces, $3,000.00; two silver vases, value unknown; two silver sconces, value unknown. The balance of the personal effects are marital property. The parties apparently intended to keep those items in the possession of each (except, of course, Howard's non-marital property, located at 515 Nemacolin Avenue). Josephine has furnishings and jewelry worth $103,239.00. Howard's furnishing are worth $56,703.00. The total is $159,942.00.

* * * * * *

10. Corporation known as Howard R. Strauss, DDS, PA. The Court finds that the corporation has goodwill value separate from the reputation, skill and experience of Howard. It finds the appraisal of market value testified to by Jon O. Clarke persuasive and accepts his valuation of $1,197,000.00. The corporate stock is wholly owned by Howard.

The trial judge supported these marital property determinations by explaining that he had "careful[ly] review[ed] . . . the evidence in light of the ten factors . . . required by Section 8–205 of the Family Law Article," which sets forth the elements to be considered in determining the amount and method of payment. In particular, the judge noted Ms. Strauss's contributions to the dental practice, and the effect of the alimony award in determining the amount of the monetary award. The judge then ordered Howard Strauss to pay the monetary award "forthwith," and ruled that the amount due would be reduced to judgment to the extent that it was not paid within thirty days.

Dr. Strauss filed a timely Motion to Alter or Amend, protesting the court's valuation of the parties' marital property as well as the resulting monetary award and amount of alimony. The court amended its previous order on 12 May 1993 to reflect a modified alimony grant of $2,000 per month

indefinitely, but left the other elements of the final divorce judgment unaltered. The court explained that in light of Ms. Strauss's "expressed needs and her ability to meet those needs," the smaller sum was more appropriate. Dr. Strauss filed a notice of appeal on 9 June 1993, and Ms. Strauss filed a cross-appeal five days later.

## MARITAL PROPERTY

### Goodwill

Maryland law requires the application of a three-step analysis when calculating a monetary award in the course of a divorce proceeding: (1) the trial court must initially characterize all property owned by the parties, however titled, as either marital or nonmarital, Md.Code (1984, 1991 Repl. Vol., 1992 Cum. supp.), § 8–203 of the Family Law Article (hereinafter "F.L."); (2) the court shall then determine the value of all marital property, *Id.* § 8–204; and, finally, (3) the court may then make a monetary award as an adjustment of the parties' equities and rights in the marital property, *Id.* § 8–205(a). *Harper v. Harper,* 294 Md. 54, 79, 448 A.2d 916 (1982); *Speropulos v. Speropulos,* 97 Md.App. 613, 618, 631 A.2d 514 (1993); *Ward v. Ward,* 52 Md.App. 336, 339, 449 A.2d 443 (1982).

Applying this three step analysis, courts are guided by the purpose of the Marital Property Act, which was designed to reflect the Legislature's goal of "correct[ing] those inequities that uncorrected historical development of the law had wrought" stemming from the husband's traditional role as breadwinner and the wife's corresponding role of family caretaker. *Unkle v. Unkle,* 305 Md. 587, 596, 505 A.2d 849 (1986) *quoting* the Governor's Commission on Domestic Relations Laws (1978) at 14. Thus, the Legislature took pains to mold a statute that recognizes that "a spouse whose activities do not include the production of income may nevertheless have contributed toward the acquisition of property by either or both spouses during the marriage" regardless of how that property may be titled. *Unkle,* 305 Md. at 595, 505 A.2d 849. The

Court of Appeals has emphasized that "careful consideration" is to be "given to both monetary and nonmonetary contributions made by the respective spouses" in fashioning the most equitable money award. *Id.*

■ Maryland caselaw, however, has carved an exception to this broad scope of includable property: Assets that are "uniquely personal" to the holder cannot, by their very nature, be held jointly with another person and, consequently, cannot be classified as marital property. *See id.* at 596, 505 A.2d 849 (personal injury claim); *Archer v. Archer,* 303 Md. 347, 357, 493 A.2d 1074 (1985) (professional degree or license). Goodwill,[2] an intangible asset that may add value to a business entity, falls within this exception.

■ As background, we note that it is well established in Maryland law that goodwill, although an intangible asset, is nonetheless a legally protected property right. *Archer,* 303 Md. at 356, 493 A.2d 1074; *Schill v. Remington Putnam Co.,* 179 Md. 83, 88–89, 17 A.2d 175 (1941); *Green v. Green,* 64 Md.App. 122, 134, 494 A.2d 721 (1985). Based on this status, the goodwill of a spouse's business is to be valued and equitably divided pursuant to the three step marital property analysis. Nevertheless, when the business in question is a sole professional practice, owners have claimed that any good-

---

**2.** The traditional definition of goodwill is "the probability that the old customers will resort to the old place," *Brown v. Benzinger,* 118 Md. 29, 35, 84 A. 79 (1912) (quoting *Cruttwell v. Lye,* 34 Eng.Rep. 129, 134 (ch. 1810). We attempted to formulate a more current definition of the term in *Prahinski v. Prahinski,* 75 Md.App. 113, 126, 540 A.2d 833 (1988), *aff'd,* 321 Md. 227, 582 A.2d 784 (1990), in which we explained that goodwill is also:

> the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed herein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

(quoting J. Story, *Commentaries on the Law of Partnership as a Branch of Commercial and Maritime Jurisprudence,* § 99, at 139 (Boston 1941).

will inuring to the entity is not marital property, but, rather, a direct reflection of the owner's reputation and skill and therefore "uniquely personal" to the holder. This rationale was first acknowledged in Maryland in *Brown v. Benzinger*, 118 Md. 29, 36, 84 A. 79 (1912), in which the Court distinguished

between the sale of the good will of a trade or business of a commercial character where the location is an important feature of the business, and the sale of an established practice and goodwill of a person engaged in a profession or calling where the income therefrom is the immediate or direct result of his labor and skill and where integrity, skill, ability and other desirable personal qualities follow the person and not the place.

The Court of Appeals followed this rationale in *Prahinski v. Prahinski*, 321 Md. 227, 228, 582 A.2d 784 (1990), in which the Court was asked to decide whether the goodwill value of a sole law practice was a component of the parties' marital property. Margaret Prahinski contended that the goodwill that had inured to her husband's legal practice during the course of their marriage was acquired, in part, because of her contributions. *Id.* at 231, 582 A.2d 784. Thus, she concluded, the equitable principles governing the division of marital property in Maryland entitled her to a portion of its value. *Id.* at 231, 582 A.2d 784. Leo Prahinski, on the other hand, maintained that because his business had always been a sole law practice, any intangible value assigned to it would, by implication, be based on his personal reputation alone. *Id.* at 232, 582 A.2d 784.

The Court of Appeals ruled in favor of Mr. Prahinski. First, the Court agreed that the goodwill of a sole law practice is inherently inseverable from the personal reputation of the sole practitioner, and, as such, cannot be marital property. The Court elaborated:

It is the attorney whose name, whether on the door or stationery, is the embodiment of the practice. . . . In the final analysis . . . it is the attorney alone who is responsible for the work that comes out of the office. Rule of Profes-

sional Conduct 5.3(c). The attorney's signature or affidavit places his seal of approval on the work being done and makes the attorney liable for its accuracy and authenticity. The professional assurance is what might have convinced some clients to use Leo F.X. Prahinski, Attorney-at-Law, instead of going to a title company to have their settlements completed. The assurance would end should Leo somehow remove himself from the practice.

*Prahinski,* 321 Md. at 239, 582 A.2d 784.

Nevertheless, the Court explicitly distinguished a number of aspects of the legal profession that make it unique in the context of evaluating goodwill. First, the Court explained that normally a professional selling his or her goodwill is obligated to abstain from practice in competition with the new owner. *Id.* at 240, 582 A.2d 784. In the legal profession, however, ethical proscriptions generally prohibit an attorney from covenanting to abstain from the practice of law, and, correspondingly, selling his or her goodwill. *Id.* The court concluded that a lawyer's inability to sell his or her goodwill weighed heavily in its determination that the goodwill was not marital property. *Id.* at 241, 582 A.2d 784.

In further support of its determination, the Court also cited sections of the Maryland Rules of Professional Conduct that prohibit an attorney from forming a partnership with a non-attorney. *Prahinski,* 321 Md. at 241, 582 A.2d 784. Based on these provisions, the Court concluded that Margaret Prahinski, as the non-lawyer spouse, was not permitted to become a partner in her husband's law practice, regardless of the extent of her assistance during marriage. *Id.* The court concluded that "[b]ecause Margaret cannot be a partner in the practice, she cannot claim a partner's interest in the practice upon her divorce from her lawyer husband." *Id.*

In *Hollander v. Hollander,* 89 Md.App. 156, 169, 597 A.2d 1012 (1991), we considered *Prahinski* in the related factual context of a sole dental practice. We carefully considered the unique attributes of the legal profession that the Court of Appeals had set forth one year earlier, and concluded that the

goodwill value of a sole dental practice can be included in the value of marital property. *Hollander,* 89 Md.App. at 169, 597 A.2d 1012. We did, however, impose limits on the extent to which professional goodwill could enter into the pool of marital property, in recognition of *Unkle* and *Archer,* by ruling that a dental practice can be properly characterized as marital property only to the extent that it has goodwill "separate from the reputation of the dentist." *Id.*

Turning to the second step of the three-part marital property evaluative process, we recognized in *Hollander* that establishing the value of professional goodwill is an inherently difficult task. *Id.* at 169, 597 A.2d 1012. This difficulty stems from the status of goodwill as an intangible property asset, which is, by nature, difficult to quantify. The problem was especially pronounced in *Hollander* because not only did the trial court face the formidable task of assigning a definitive monetary value on the total amount of goodwill in Dr. Hollander's practice, but the court was also required to separate the value of the dentist's reputation from the value of the remainder of the intangible assets of the practice, e.g. location of offices, a favorable leasehold, credit records, and the like.

We did not conduct such an analysis in *Hollander.* Although we explicitly recognized that "the intricacy" of formulating a goodwill value "should not force any court to shirk its responsibility nor ignore the basic fact that goodwill holds considerable value for the professional," the issue had simply not been preserved for appeal.[3] *Id.* at 169, 174, 597 A.2d 1012.

---

**3.** Although we refrained from delving into the details of the trial court's methodology used to create a goodwill value, we did provide some guidance for future cases. First, we distinguished goodwill from future earnings capacity, explaining that "a professional can transport all of his skill (earning capacity) to a new town, but patients or clients, reputation and referrals (goodwill) cannot always be transported." *Hollander,* 89 Md.App. at 169, 597 A.2d 1012 (quoting *In re Marriage of Hall,* 103 Wash.2d 236, 692 P.2d 175, 178 (1984). To this end, we discouraged one common analysis used to measure goodwill, the excess earnings method, because the value arrived at under this calculation "represents nothing more than an entity's future earning capacity."

In *Fox v. Fox,* 85 Md.App. 448, 584 A.2d 128 (1991), the goodwill valuation issue—and its corresponding intricacies—were preserved for appeal. In *Fox,* we considered the testimony of an expert witness and concluded that "his ratiocination or his ultimate opinion based thereon [was not] totally devoid of reason or logic." *Fox,* 85 Md.App. at 459, 584 A.2d 128. We therefore found "nothing arbitrary or capricious in the chancellor's acceptance of it" and affirmed this aspect of the court's reasoning. *Id.*

The lower court's decision in the case *sub judice* similarly relies on expert testimony. Thus, our task, like that in *Fox,* is to evaluate the reasoning and logic of appellee's expert, Jon O. Clark, on which the trial court relied. We note that our job on appeal is not to re-weigh expert testimony, but to assure that there is an adequate foundation for the opinion rendered below. *Moseman v. City Council,* 99 Md.App. 258, 267, 636 A.2d 499 (1994).

Upon close examination of Mr. Clark's expert testimony, material inconsistencies become apparent. First, during his direct examination, Mr. Clark listed an "individual's name" as being among the factors encompassed in the *Goodwill Registry*'s definition of "goodwill." Mr. Clark accepted this inclusion again during his cross-examination, in which he agreed that, pursuant to the *Registry,* an "individual's name and reputation" are components of goodwill. On the other hand, Mr. Clark also testified that the *Goodwill Registry* market data on which he based his opinion did not represent personal goodwill. Thus, Mr. Clark apparently included reputation as a part of goodwill's definitional "bundle of intangibles" and then deemed it absent in his computations, the practical application of the definition.

It is difficult to reconcile this discrepancy. Our clearest window into Mr. Clark's reasoning and logic is in his blanket statement that the *Goodwill Registry*'s appraisal does not

---

*Hollander,* 89 Md.App. at 174, n. 8, 597 A.2d 1012, *quoting Prahinski,* 75 Md.App. at 132, 540 A.2d 833.

include personal goodwill because one may "assume, as the Courts have assumed, that personal goodwill cannot be sold [or] transferred." This application of Maryland law is flawed. Mr. Clark apparently misinterpreted the holdings of *Prahinski* and *Hollander*. These cases do direct that the value of personal goodwill is not subject to distribution or inclusion in a marital award. Nevertheless, when performing a goodwill valuation analysis, one should ascertain first, whether in the particular case there exists a personal component, and secondly, if it does exist, determine the value of the personal component in the initial computation so that it can subsequently be excluded from the total valuation for purposes of fashioning an appropriate award.

Moreover, during cross-examination, Mr. Clark acknowledged that it is possible to separate the general goodwill of the business from that which is attributable solely to the personal reputation of the practitioner. Yet, the expert also conceded to the court that he did not do so in the instant case, and, in fact, he knew of no methodology to achieve this objective. Thus, Mr. Clark apparently did not apply the *Unkle* and *Archer* principle that uniquely personal assets are deemed outside of the realm of marital property, and thereby violated Maryland law when he utilized the total goodwill figure in his computation.

Neither we nor the trial court can assume, simply because caselaw has established a rule mandating the separation of professional and personal goodwill, that the *Goodwill Registry* has implicitly adopted this dictate in its report of representative transactions—especially in light of indications to the contrary. Because the *Goodwill Registry* makes no effort to segregate or identify the personal aspects of its goodwill valuations, and Ms. Strauss's expert relied on these values without attempting to isolate any personal components of the goodwill value of Dr. Strauss's practice, the foundation of his reasoning and logic is not reliable on its face.

We must therefore reverse the trial court's decision in this respect and remand the case for further proceedings utilizing

a legally correct methodology—one that contemplates the value of Dr. Strauss's professional goodwill without including the personal goodwill of his practice. Our ruling, however, does not indicate that the trial court is obligated to rely solely on the testimony of Dr. Pollock, Dr. Strauss's expert, on remand. Rather, we decide only that because Mr. Clark's opinion was not supported by its underlying justification, the trial judge erred in relying on his resulting computations.

## Tangible assets of the professional practice

 The circuit court relied on the testimony of Ms. Strauss's expert, Jon Clark, to establish the value of the tangible assets of Dr. Strauss's dental practice. Mr. Clark stated that the adjusted book value of the business was worth $546,000, and explained that he arrived at this total primarily by relying on a federal tax return for the fiscal year ending 30 June 1992. He also reviewed additional sources of information compiled after this date. Thus, Mr. Clark testified that the $546,000 figure was valid as of 25 January 1993, the date of trial. In Maryland, marital property is to be valued as of the date of divorce based on the evidence produced at trial, unless the parties agree on a different date. *Cotter v. Cotter,* 58 Md.App. 529, 536–37, 473 A.2d 970 (1984); *Dobbyn v. Dobbyn,* 57 Md.App. 662, 676–77, 471 A.2d 1068 (1984). The date of the parties' divorce was 26 February 1993.

Dr. Strauss contends that the $546,000 figure offered by Mr. Clark was a speculative estimate of the value of the practice as of 30 June 1992, the close of the fiscal year, and did not accurately reflect its value as of 31 December 1992, which Dr. Strauss apparently deemed as the appropriate milestone date. He also cites as problematic Mr. Clark's failure to inspect personally the corporation's offices or examine appraisals of the supplies, equipment, furniture, or leasehold improvements. Dr. Strauss claims that the computations performed by his expert were more accurate.

 On appeal, we must uphold the evidentiary conclusions of the trial court unless clearly erroneous. Md.Rule 8–131(c).

Ms. Strauss's expert used the most recent federal tax return valuing Dr. Strauss's dentistry practice, and considered additional data after this point. The strength of this method relative to the accuracy of the analysis performed by Dr. Strauss's expert is immaterial to our standard of review. We cannot conclude that the trial court clearly erred by accepting Mr. Clark's evaluation, and we therefore affirm the court's determination of the dental practice's tangible assets.

### Valuation of the parties' personal property

■ Dr. Strauss next contends that the trial court erred by including the value of certain items of his nonmarital personal property in its marital property computation. He claims specifically that the trial court erroneously increased the total value of his marital property from $53,473, the amount stipulated by the parties at the outset of trial, to $56,703. He refers to the 26 February 1993 Memorandum & Judgment to explain this $3,230 difference, noting the court found that certain items of Dr. Strauss's personal property valued at $3,230 were given to him as gifts.

It is clear under Maryland law that gifts are not to be considered marital property. F.L. § 8–201(e)(2)(ii); *Paradiso v. Paradiso,* 88 Md.App. 343, 358, 594 A.2d 1200, *cert. denied,* 325 Md. 95, 599 A.2d 447 (1991). The court apparently included the $3,200 value of appellant's gifts in its $56,703 total. It then applied this final amount in its calculation of Ms. Strauss's monetary award. Because gifts are not to be included as a part of the parties' marital property, we must vacate Ms. Strauss's monetary award on this ground as well.[4]

---

4. Dr. Strauss raises in his Reply Brief a claim that an automobile that had been a corporate asset as of 30 June 1992 was transferred to Ms. Strauss before trial and not included in the calculation of her monetary award. We chose not to address this contention, as the scope of a reply brief is limited to the points raised in appellee's brief, which, in turn, address the issues originally raised by appellant. Md.Rule 8–502; *Federal Land Bank v. Esham,* 43 Md.App. 446, 459, 406 A.2d 928 (1979). A reply brief cannot be used as a tool to inject new arguments.

### The trial court's order to pay the monetary award "forthwith"

 The trial court ordered Dr. Strauss to pay the monetary award "forthwith," and further ruled that the order would be reduced to judgment to the extent that it was not paid within thirty days. Dr. Strauss contends that the court abused its discretion concerning this method of payment by (1) failing to apply the statutory factors required in determining the amount and method of payment of monetary awards as established by F.L. § 8–205(b), and (2) refusing to recognize the confiscatory effect of ordering immediate payment. Although we need not address this in view of the other reasons we have previously given for reversing and vacating the marital award, we shall comment on this argument for the guidance of the circuit court on remand.

We have previously recognized the general validity of similar contentions. For example, in *Cotter v. Cotter,* 58 Md.App. 529, 541, 473 A.2d 970 (1984), we held that a divorce decree that granted alimony and a monetary award in excess of the paying spouse's income clearly indicated that the trial judge did not take into account all of the required statutory factors. Similarly, in *Rosenberg v. Rosenberg,* 64 Md.App. 487, 522–23, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985), we ruled that a judge erred in considering an individuals' substantial borrowing power to pay a monetary award absent concrete evidence to support this finding. Finally, in *Merriken v. Merriken,* 87 Md.App. 522, 545, 590 A.2d 566 (1991), we remanded a marital property determination and ordered the lower court to consider potential tax consequences as a factor under § 8–205(b) in fashioning a new monetary award, provided that the evidence of financial hardship from these newly imposed taxes is "more than merely speculative." *Merriken,* 87 Md.App. at 545, 590 A.2d 566, *quoting Quinn v. Quinn,* 83 Md.App. 460, 473, 575 A.2d 764 (1990).

 In the instant case, however, there is ample evidence that the judge relied on the statutory factors of F.L. § 8–205(b) to support his decision. First, this provision is explicitly mentioned and applied in the marital property discussion of

the 26 February 1993 Memorandum and Judgment. It was also unnecessary for the judge to recapitulate these previously articulated factors in his 12 May 1993 Order in response to the Motion to Alter or Amend Judgment. On the record as a whole, it is clear that the trial judge was aware of and considered the statutory factors. Moreover, "[a]bsent an indication to the contrary, we must assume that judges apply the law correctly to the case before them." *Major v. First Virginia Bank,* 97 Md.App. 520, 542, 631 A.2d 127 (1993), *quoting, Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583 (1976). Dr. Strauss has not provided a sufficiently forceful argument to render the trial court's application of the law suspect.

We are similarly unpersuaded that the effect of the trial court's ruling was confiscatory. The trial judge clearly weighed the evidence and considered the financial status of the parties. Dr. Strauss' financial position is strong in terms of his liquid assets as well as his ability to obtain additional funds. His argument concerning this aspect of the monetary award holds little credibility, and we remain unconvinced that the trial court's judgment on the evidence was clearly erroneous.

### ALIMONY

Under Maryland law, alimony and monetary awards are significantly interrelated. *Compare* F.L. § 8–205(b)(9) (ordering courts to consider any alimony payments granted when determining the amount of a monetary award) *with* F.L. § 11–106(b) (directing courts to consider a party's monetary award when establishing the amount of an alimony award). Thus, the decision to award one form of payment must be made in conjunction with a determination of the second form of payment. Because we shall reverse and vacate the marital property monetary award, we must therefore similarly vacate and remand the grant of alimony. *See Alston v. Alston,* 331 Md. 496, 509, 629 A.2d 70 (1993) (remanding the issue of alimony upon reversing the trial court's judgment relating to the monetary award).

**512**

■■■■■■ Although this provides a sufficient basis on which to vacate the trial court's alimony determination, we also note that sufficient independent grounds exist to justify a reversal of the alimony determination. In its 12 May 1993 Order, the court based its decision to reduce the alimony award by $13,000 per month on Ms. Strauss' "expressed needs and her ability to meet those needs." The underlying purpose of alimony is not designed to create a subsistence level for the more dependant spouse; rather, the court is required to consider numerous factors, including the lifestyle to which he or she had become accustomed. F.L. § 11–106(b). Although the dependent spouse's financial needs and resources are to be a part of the court's consideration when fashioning a fair and equitable alimony award, they are not determinative. *See id.* § 11–106(b). The failure of the trial court to consider Ms. Strauss' standard of living beyond her "expressed needs" provides a second ground on which to vacate and remand the alimony determination.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY EACH PARTY.**